Midland Ford Tractor Company, a corporation v. Commissioner.
Midland Ford Tractor Co. v. Commissioner
Docket No. 59299.
United States Tax Court
T.C. Memo 1958-213; 1958 Tax Ct. Memo LEXIS 11; 17 T.C.M. (CCH) 1060; T.C.M. (RIA) 58213; December 17, 1958
*11 Robert Ash, Esq., Carl F. Bauersfeld, Esq., and Don O. Russell, Esq., 408 Olive Street, St. Louis, Mo., for the petitioner. Richard G. Worden, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in petitioner's income tax for the fiscal years ended June 30, 1951 and 1952, in the amounts of $139,128.94 and $114,225.43, respectively. The questions presented are: (1) Whether rental payments were required as a condition to the continued use or possession of the leased property; (2) whether salaries paid to petitioner's officers were reasonable compensation for services rendered. Findings of Fact Certain facts were stipulated and are incorporated herein by this reference. Petitioner is a Missouri corporation with its principal place of business in Hazelwood, St. Louis County, Missouri. Petitioner filed income tax returns for fiscal years 1951 and 1952 with the then collector of internal revenue for the first district of Missouri. It keeps its books and records on an accrual basis and reports its income for fiscal years ending June 30. Petitioner was incorporated on June 27, 1947 and issued *12 250 shares of stock equally to John J. Graham, Louis Clay, Sr., and Tom W. Dutton, hereafter referred to as Graham, Clay and Dutton, respectively. On or about August 15, 1948, Clay transferred to his son, Louis Clay, Jr., 33 shares. No further transfers were made prior to June 30, 1952. The officers and directors of petitioner since its organization and during the controversial period were Graham, president, Clay, vice-president and Dutton, secretary-treasurer. Petitioner's business consisted of distributing Ford tractors, farm implements and equipment, industrial equipment and parts and accessories to dealers in 46 counties in eastern Missouri and 61 counties in southern Illinois, hereafter referred to as the St. Louis area, pursuant to a written contract with Dearborn Motors Corporation, hereafter referred to as Dearborn. This contract was terminable by either party on 30 days' notice. Dearborn cautioned petitioner that it might distribute its products directly and petitioner would lose its distributorship. Prior to 1947 Ford Motor Company, hereafter referred to as Ford, manufactured farm tractors and related equipment for Harry Ferguson, Inc., hereafter referred to as Ferguson. *13 Ferguson marketed the "Ford-Ferguson" tractor and "Ferguson Farm" implements through 32 independent distributors. In October 1943, Clay and Dutton formed Clay-Dutton Inc., a Lincoln-Mercury dealership in New Orleans, Louisiana. In 1944, Clay-Dutton, Inc., procured the retail franchise for the sale of Ford-Ferguson tractors and the Ferguson system of implements. Following a series of disagreements, Ford and Ferguson dissolved their relationship in June 1947 and Ford manufactured these products for Dearborn, a corporation controlled by the officers and directors of Ford. Southern Ford Tractor Corporation, hereafter referred to as Southern Ford, was a former Ferguson distributor in New Orleans, Louisiana, owned by Clay and Dutton. In January 1947, Clay and Dutton were notified of the Ford-Ferguson severance and the formation of Dearborn. Southern Ford became a Dearborn distributor in 1947. Between February 1947 and June 1947, Clay and Dutton decided to procure another tractor distributorship and conferred in Detroit with officials of Dearborn. Upon advice that the St. Louis distributorship was available, Clay and Dutton investigated farm conditions thereabouts. They determined that *14 the farm equipment business in that area was highly competitive and would require not only their constant attention and supervision but also a capable and experienced associate to handle the daily details of the operation of the business. They solicited Graham who had many years of experience with Ford in various managerial capacities. Dearborn required their distributors to produce $100,000 minimum operating capital and to establish suitable physical facilities. Clay, Dutton and Graham formed petitioner which became Dearborn's distributor in the St. Louis area. They borrowed the necessary capital from Universal C.I.T. Corporation. A personal loan of $25,000 was made to Clay, Dutton and Graham and used to purchase the original stock in petitioner. After petitioner was organized, the Universal C.I.T. Corporation loaned petitioner an additional $75,000. Dearborn granted petitioner the distributorship because of the past performance of Southern Ford, the financial ability of Clay and Dutton to carry on a distributorship and the employment of Graham. Employees of Southern Ford trained petitioner's new personnel. Petitioner had contracts with 110 to 120 dealers in the St. Louis area *15 from April 30, 1948 through June 30, 1952 and was one of Dearborn's most successful distributorships. Ferguson brought suit against Ford, Dearborn and all its officers in the United States District Court for the Southern District of New York for $250,000,000. Clay was subpoenaed by Ferguson individually and as an officer-director of petitioner, Clay-Dutton, Inc., and Southern Ford. His deposition was taken in New Orleans, Louisiana, from October 13 through October 17, 1950 and covered 315 pages. Petitioner was not a defendant in this suit. On September 21, 1948, Berry Tractor and Equipment Co., Inc., hereafter referred to as Berry, as plaintiff, sued Ford, Dearborn and other defendants including petitioner and petitioner's officers in the United States District Court for the Eastern District of Missouri for $10,500,000 under the Clayton Act. Berry was a Ferguson distributor in the St. Louis area and 1 of the 6 distributors that remained with Ferguson in 1947. This lawsuit was dismissed in April 1952 and neither petitioner nor its officers paid damages. During the controversial years, petitioner's officers conferred with other defendants in this suit. Clay and Dutton refrained from *16 entering St. Louis to avoid service of process. They performed duties for petitioner in East St. Louis and at regional meetings. Petitioner's earned surplus account from fiscal years 1948 through 1952 was $214,065.64, $595,603.53, $744,239.33, $920,799.74 and $1,049,415.77, respectively. No reserve account for possible litigation expenses appeared on petitioner's balance sheets from 1949 through 1952. Delta Realty Company, hereafter referred to as Delta, was incorporated in Missouri on April 14, 1949. The stockholders and officers of Delta at the time of incorporation and during the controversial years, and the shares held by each were as follows: Name and Title
No. of Shares
Tom W. Dutton, president
333 1/3
Flossie Graham (wife of John J.
Graham), secretary-treasurer
333 1/3
Louis H. Clay, Sr., vice-president
166 2/3
Louis H. Clay, Jr.
166 2/3 Delta received $1,000 in payment for the 1,000 shares of stock issued at or about the time of its incorporation. This was the entire amount of its paid-in capital. From the date of its incorporation through approximately September 1949, petitioner temporarily operated its business at Vanderventer Avenue in St. *17 Louis. This property was leased for approximately $1,000 per month. On November 29, 1948, petitioner acquired 6.148 acres of unimproved land on Lindbergh Boulevard in Robertson, Missouri, for $11,269.85. This area was developing into the leading industrial district of St. Louis County. Petitioner sold this land to Delta on April 28, 1949 for $11,269.85, which Delta paid December 1, 1949. The net sales of petitioner for fiscal year 1949, as of March 31 and April 30, were $5,882,274.93 and $6,749,333.74, respectively. On or about April 28, 1949, Delta and petitioner entered into a written lease agreement covering the land, and a building which was to be erected, both hereafter referred to as the Lindbergh Boulevard property. The lease provided, among other things: * * *
"1. * * * TO HAVE AND TO HOLD THE SAME, * * * for * * * [a] term * * * commencing on * * * September [1,] 1949, and ending on * * * August [31,] 1954. "2. Lessee shall pay * * * a fixed minimum yearly rental of * * * $18,000.00, payable in equal monthly installments, in advance, of * * * $1,500.00 * * *. "3. Lessee shall also pay to Lessor an additional rental for said premises for each lease year *18 in which one per cent * * * of the net sales * * * of Lessee exceeds the fixed minimum yearly rental, such additional rental to be equal to the amount by which one per cent * * * of the net sales of Lessee exceeds such fixed minimum yearly rental. Such additional rent shall be payable as follows: On or before the 15th day of the following month, Lessee shall pay to Lessor the amount by which one-half * * * of one per cent * * * of the net sales during such preceding month exceeds * * * $1,500.00. * * *
"* * * Lessee shall, on or before the fifteenth day of each month during the whole term of this lease and of the month following the expiration thereof, render to Lessor an accurate statement showing the net sales of Lessee for the preceding month * * *. "4. Lessee * * * agrees * * * [to] pay * * * taxes, duties, assessments, * * * "5. * * * carry insurance * * * [upon] the improvements * * * now or hereafter erected on the leased premises * * *. * * *
"7. [Maintenance expenses.] "8. Lessee, upon the signing of this lease, is to deposit with Lessor * * * $25,000.00 as security * * *. * * *
"12. Lessee shall have the option to * * * [renew this lease *19 for an additional 5 years.]" Delta erected a building on the leased premises at an approximate cost of $120,000. Delta executed and delivered demand notes to and borrowed from the Tower Grove Bank, St. Louis, Missouri, the following amounts: Date
Amount
6/ 2/49
$12,000.00
8/ 1/49
30,000.00
8/31/49
42,000.00
9/ 9/49
20,000.00
10/14/49
10,000.00
11/10/49
25,000.00
12/ 5/49
97,000.00 The loan of August 31, 1949 was a renewal of the two prior loans. The loan of December 5, 1949 was a renewal of unsatisfied prior loans. On January 12, 1950, the loan account was closed by transfer to the bank's real estate department of the $97,000, an additional $48,000 was loaned to Delta and a deed of trust covering the Lindbergh Boulevard property was executed by Delta to secure repayment of the $145,000. The monies borrowed from Tower Grove Bank were used to finance the construction of the building on the Lindbergh Boulevard property. Delta made regular payments pursuant to the mortgage and on December 3, 1952 made an advance payment of $30,000. On or about June 1, 1954, the unpaid balance of $25,000 was renewed until June 1, 1955. Eleven monthly payments of $1,250 *20 were made and the balance of $11,250 was paid in full on May 29, 1955. This was a building with limited uses. It could be used for warehousing and industrial operations. The building, completed in the fall of 1949, contains a total of approximately 31,000 square feet and is constructed of brick, concrete block, steel sash and metal ceilings. The office space is about 5,000 square feet and is finished with plastered walls and tile floors. A smaller building containing about 4,000 square feet was erected on the property during the year 1952. No depreciation was claimed on this second building in the income tax return filed by Delta for the taxable year ended March 31, 1952. Petitioner occupied the Lindbergh Boulevard property during 1951, 1952 and for 9 months during fiscal year 1950. Expenses incurred by petitioner pursuant to the lease from fiscal year 1950 through fiscal year 1952 were: Mainte-
Year
Rent
Taxes
Insurance
nance
1950
$63,707.17
$ 3.85
$419.95
$3,538.11
1951
82,729.70
1,451.92
839.64
1952
79,550.81
1,562.40
840.78
842.35
On February 16, 1955, Melvin Dubinsky, a witness on behalf of petitioner, estimated the fair *21 rental value of the Lindbergh Boulevard property as of April 28, 1949 to be $26,250. The lease agreement between Delta and eptitioner entered into on April 28, 1949 was not at arm's length. The rental was unreasonably high. In 1951 and 1952 amounts paid as rent by petitioner to Delta exceeding $37,500 per year were not required to be made as a condition to the continued use and possession of the property. The farm equipment business fluctuates because it follows farm income. Petitioner was required to carry inventories of farm tractors and approximately 115 different types of implements, corn pickers, combines, side delivery rakes, forage harvesters, hay balers and cotton pickers. Petitioner used the original $100,000 of capital for payment of sight draft bills of lading on tractor parts, implement parts and accessory inventories plus an amount for operating expenses. Petitioner arranged with Universal C.I.T. Corporation to finance by the floor plan method its inventory of tractors and farm implements which required the personal endorsement of Clay, Dutton and Graham. In 1951 and 1952, Clay and Dutton devoted part of their time, and Graham devoted his entire time, to petitioner. *22 Clay, in addition to advisory duties and assistance to Graham, was responsible for policies and contacts between Dearborn and petitioner and for the procurement of outside implements, assessories and other items necessary to assist dealers on a more profitable basis. Dutton, in addition to advisory duties and assistance to Graham, was responsible for all financial matters. Graham was petitioner's general manager with full and complete charge of the operation of the business. Petitioner's officers were engaged in the distribution, sale, promotion and demonstration of tractors and equipment. They trained distributor, dealer and sales personnel. They forecasted and determined what different implements and tractors would be needed in the business and required for plowing, planting, cultivating and harvesting. They ordered these from Dearborn and other farm equipment manufacturers. The officers determined the actual and potential use in the St. Louis area of newly introduced equipment. They ordered parts for servicing the tractors. The officers encountered problems in connection with a change in a brand name and defective equipment. In addition to Graham, Clay and Dutton, petitioner *23 employed 45 to 50 people, including a sales manager, parts manager, product education manager, advertising and promotion manager, business management manager and 6 to 8 district supervisors. From 1947 through January 9, 1950, petitioner's directors voted the following monthly salaries for themselves as officers: 6/24/47
12/6/47
1/12/48
1/10/49
1/9/50
Clay
$ 500
$ 500
$ 500
$ 500
Dutton
500
500
500
500
Graham
$1,000
1,500
1,500
1,500
1,500
Petitioner's accountant wrote a letter to Graham on November 21, 1950. It contained, in part, the following: "I have studied over carefully the figures of your company for the past three fiscal years and have come to the conclusion regarding compensation to be paid to the officers of the company that should be considered reasonable by the Internal Revenue Department. "In my opinion, a salary of $48,000.00 a year could be paid to you as a full time official of the company, while remuneration of $18,000.00 per year, each, for Mr. Clay and Mr. Dutton for their part time services in behalf of the company could be justified. "In arriving at my conclusions I have taken into consideration the *24 volume of business done by the company, the net profits that have resulted from its operation, the dividends that have been paid, as well as, the ability of the officers and the services which they have rendered to the corporation. These salaries would be less than one and one-quarter per cent of the total volume of business done by the company and less than twenty per cent of the net profits of the company before considering salaries of officers as an expense. These factors are all in your favor and should justify the remuneration stated above." The directors met on November 27, 1950 and the minutes in part provided.. "The chairman stated that the purpose of the meeting was to definitely fix the compensation of the officers of the company which had been discussed previously from time to time. "The chairman stated that, in his opinion, the finances and stability of the company was such, now, that it was not necessary for the officers to further postpone taking compensation commensurate with the services they were rendering to the company. He further stated that in addition to a monthly salary the officers of the company should share in the profits of the company in excess of *25 a given amount, inasmuch as the earnings of the company were largely dependent upon the efforts put forth by the officers. "A lengthy discussion followed, after which a motion was made and seconded, fixing the monthly salaries of the officers effective December 1, 1950, as follows: per month
"John J. Graham, President
$2,500.00
L. H. Clay, Vice President
1,500.00
T. W. Dutton, Secretary and
Treasurer
1,500.00
"In addition to the above salary each officer is to receive, at the close of the corporation's fiscal year, June 30th, additional compensation if earnings of the company are in excess of $100,000.00, after considering above salaries as an expense and before considering federal income and excess profits taxes and state income taxes as a deduction; said additional compensation to be computed as follows: "John J. Graham, President, 12-1/2% of the net profits, in excess of $100,000.00, before considering federal and state income and excess profits taxes as a deduction. "L. H. Clay, Vice President, 10% of the net profits, in excess of $100,000.00, before considering federal and state income and excess profits taxes as a deduction. "T. W. Dutton, Secretary *26 and Treasurer, 10% of the net profits, in excess of $100,000.00, before considering federal and state income and excess profits taxes as a deduction." Petitioner's net sales, gross profit, net income, total compensation paid to its officers and net income before officers' compensation for the fiscal years 1948 through 1952, inclusive, were (in even dollars) as follows: Total Com-
Net Income
Fiscal
Net
Gross
Net
pensation
Before Officers'
Year
Sales
Profits
Income
of Officers
Compensation
1948
$4,338,106
$510,049
$346,187
$ 38,267
$384,455
1949
7,854,864
887,953
625,453
55,500
680,953
1950
7,203,868
796,265
441,092
55,500
496,592
1951
8,272,478
951,347
413,841
203,563
617,404
1952
7,955,079
904,086
354,575
189,784
544,360
Petitioner claimed deductions for officers' compensation on its income tax returns for the fiscal years 1948 through 1952, inclusive, (in even dollars) as follows: 1948
1949
1950
1951
1952
Graham -
Salary
$17,000
$18,000
$18,000
$25,000
$30,000
Bonus
5,089
8,500
8,500
58,678
47,609
Totals
$22,089
$26,500
$26,500
$83,678
$77,609
Clay -
Salary
$ 3,000
$ 6,000
$ 6,000
$13,000
$18,000
Bonus
5,089
8,500
8,500
46,942
38,087
Totals
$ 8,089
$14,500
$14,500
$59,942
$56,087
Dutton -
Salary
$ 3,000
$ 6,000
$ 6,000
$13,000
$18,000
Bonus
5,089
8,500
8,500
46,942
38,087
Totals
$ 8,089
$14,500
$14,500
$59,942
$56,087
Grand Totals
$38,267
$55,500
$55,500
$203,562
$189,783
*27 In 1951 and 1952, Clay and Dutton received compensation for services from enterprises other than petitioner (in even dollars) as follows: 1951
1952
Clay
Dutton
Clay
Dutton
Clay-Dutton, Inc.
$23,000
$25,000
$23,000
$25,000
Southern Ford
25,000
23,000
25,000
23,000
Riverside Motors, Inc.
1,200
1,200
1,200
1,200
Delta
3,000
3,000
3,000
3,000
Opdenweyer Alcus Co.
2,950
3,000
From 1949 through 1952, respectively, petitioner paid the following dividends: $6,250, $125,000, $50,000 and $50,000. Petitioner paid no dividends in 1948. No part of the compensation paid in 1951 and 1952 by petitioner to its officers for services rendered represented payment for services rendered in prior years. Reasonable compensation for services rendered to petitioner by its officers was $102,000 and $100,000 for the respective fiscal years 1951 and 1952. Opinion The parties are in virtual agreement on most aspects of the present controversy, except for the ultimate issues. These are solely factual and are disposed of in our findings. See . But the considerations to be taken *28 into account in arriving at these conclusions are scarcely in dispute at all. Thus, in dealing with the contested deductions for rent and officers' compensation, it is apparently accepted by both sides that the arrangements involved were not made at arm's length because of the close relationship of the parties, on the one hand, but that, on the other, the question for our decision is what would have been agreed upon under similar circumstances between unrelated parties; that the extent to which the expenditures in question are deductible is a question of fact to be determined in the light of all the circumstances as they existed at the time the amounts were fixed and without giving undue weight to any single aspect; that in the case of rent or compensation dependent upon earnings, a larger figure may be justified in the light of the possibility that other less successful years will compensate for those unusually prosperous; that the fair rental value of the property under a fixed rental agreement with a reasonably long term and a wholly responsible tenant would be somewhere in the neighborhood of $26,000 a year; and that the fact that an officer devotes only part of his time to his *29 duties for his employer may be taken into account in fixing reasonable compensation. As to the rental issue, under all the circumstances, including the type and term of the lease, we have found that a rental figure for the property reasonably required for its continued use by petitioner during the years in controversy was not in excess of $37,500 a year. In arriving at this figure we have taken into consideration what we have determined to be a reasonable rental if the amount were definitely fixed in advance for a customarily long term, and also what percentage of net sales would be adequate to induce an unrelated landlord to enter into a comparable agreement at the time of the original lease. See , reversing . The amount properly deductible as rent incorporated in our findings is consistent with our conclusions in these respects. A minimum amount of $18,000 was payable in any event, even in a bad year. The difference represents the most we think petitioner's landlord could reasonably expect in a good year for his risk on account of the percentage clause and the *30 possibility of nonrenewal. One contention advanced by respondent should perhaps be briefly noted. In discussing the short term of the lease, he says in his brief: "* * * in view of the close relationship between the lessor and the lessee, the term of the lease is unimportant." The inconsistency thus suggested is one with which we cannot agree. Respondent's position is that the lease was unreasonable because the relationship of the parties prevented them from dealing at arm's length, and the resulting arrangements must be scrutinized accordingly. If we are attempting to ascertain what terms would have been agreed upon by unrelated parties, we cannot at the same time assume that the term of the lease is unimportant for the very reason that the parties were related. Again considering all the circumstances, we have concluded that reasonable compensation to petitioner's three officers for 1951 would not exceed $102,000, and for 1952, $100,000. Since we have taken into consideration the contingent character of a part of the compensation paid to the officers, it seems appropriate that the total reasonably necessary for 1952 should be somewhat less than that for 1951. And the fact that *31 two of the three officers concerned spent only part of their time on petitioner's problems indicates that a total reasonable compensation payable to all the officers is a more logical approach than an effort to allocate this amount among the three officers. We have made our findings accordingly. On the entire record we have concluded as appears in our findings that respondent's determination is disapproved to the extent indicated. Decision will be entered under Rule 50.